No. 13-13106

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA
*Appellee*

v.

MARK ANTHONY MYRIE
*Defendant/Appellant*

On Appeal from the United States District Court
for the Middle District of Florida
District Court Case Number 8:09-CR-572

REPLY BRIEF OF THE APPELLANT

MAX D. STERN
JOHN H. CUSHMAN
Stern, Shapiro, Weissberg & Garin
90 Canal Street
Boston, MA 02114
Tel: (617) 742-5800
Fax: (617) 742-5858

CHARLES J. OGLETREE, JR.
516 Hauser Hall
1575 Massachusetts Avenue Cambridge,
MA 02138
Tel: (617) 496-2054
Fax: (617) 496-3936

## TABLE OF CONTENTS

Introduction ...................................................................................................1

Discussion ....................................................................................................2

I.        The government is unable to meet its burden to prove that the impact of extrinsic information on the jury was limited to the issue of *Pinkerton* liability..2

II.       Even if Wright's research was limited to *Pinkerton* liability, the government cannot prove that her research was harmless as to the other two conspiracy counts on which Myrie was convicted. ...................................................6

III.      The government's evidence in the underlying case was not so overwhelming as to render Wright's misconduct harmless.......................................9

Conclusion ..................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Pinkerton v. United States*, 328 U.S. 640 (1946)......................................................7

*United States v. Bolinger*, 837 F.2d 436 (11th Cir. 1988).......................................11

*United States v. Myrie*, 479 F. App'x 898 (11th Cir. 2012) ....................................10

*United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011) .................................11

*United States v. Spurlock*, 811 F.2d 1461 (11th Cir. 1987).......................................3

*United States v. Townsend*, 502 F. App'x 870 (11th Cir. 2012) ...............................5

# INTRODUCTION

The government's brief fundamentally fails to respond to the serious issues in this case. It downplays the jury foreperson's misconduct, speculating that the law she derived from sites like Wikipedia in defiance of the Court's instructions was probably consistent with the legal instructions from the Court itself – while ignoring the judge's finding that she falsified evidence to make it impossible to determine the scope of her research. The government discusses *Pinkerton* liability, at length, without ever defining what "*Pinkerton* liability" actually is – because the definition makes clear that the judge should have granted a new trial as to the other two conspiracy counts. And it closes by arguing for harmless error, recounting the facts in the light most favorable to itself – a standard to which it has no claim in cases of juror misconduct.

Throughout, the government fails to acknowledge the "heavy burden" it bears to prove that Mark Myrie received a fair trial in spite of juror misconduct. It repeatedly accuses *Myrie* of "speculation," citing to cases where the defendant rather than the government bore the burden of proof, to cover the fact that it has adduced no evidence rebutting the presumption of prejudice. The reality is that a juror researched issues going to the heart of this case during deliberations in order

1

to inform her vote and that of her fellow jurors; the juror intentionally and successfully concealed the full nature and extent of her research; and the government cannot meet *its* burden to establish that the trial was fair. Myrie is entitled to a new trial on all counts.

## DISCUSSION

**I.      The government is unable to meet its burden to prove that the impact of extrinsic information on the jury was limited to the issue of *Pinkerton* liability.**

This appeal can be resolved by two simple, indisputable facts: that the jury foreperson conducted internet research to inform her decision during deliberations; and that, when confronted, she deliberated and successfully concealed the extent of her research. Any verdict reached with such a foreperson is constitutionally infirm beyond redemption, and requires a new trial on all counts.

The first section of the government's brief seeks to avoid this conclusion by arguing that the Court should assume that the juror's research was strictly limited to *Pinkerton* liability, and therefore that the judge properly refused to grant a new trial on the two counts not based upon *Pinkerton* liability; any other conclusion, the government contends, would require "this Court to speculate" without basis in the

2

record. (G.Br. 23-28.) This argument reverses the burden of proof: once the defendant establishes that extrinsic evidence reached the jury, the government bears the "heavy burden" to prove that the jury was unaffected. It cannot do so.

As the government concedes, once a defendant makes a "colorable showing" that the jury was exposed to extrinsic evidence, the burden shifts to the government to show that "the jurors' consideration of extrinsic evidence was harmless to the defendant." (G.Br. 24 *and cases cited*.) In contrast to the "colorable showing" required of the defendant, *id.*, the standard the government must meet is "a heavy burden[.]" *United States v. Spurlock*, 811 F.2d 1461, 1463 (11th Cir. 1987).

In this case, Myrie made a colorable showing (and the judge found as fact) that: the jury foreperson, Terri Wright, did internet research during the course of deliberations to help her decide how to vote; she shared her research with other jurors; and when her computer hard drive was subpoenaed in order to determine the scope of her research, she provided a different hard drive than the one she used to do her research, making it impossible to limit the extent of her misconduct.[1]

---

[1] Regarding the computer hard drive, the government presents an absurdly misleading statement of the evidence, stating that "The computer expert, Lawrence Daniel, testified that he had examined Wright's hard drive and that, 'for the period of time in which the trial occurred, there were no Internet records at all.' He also said that he had found no evidence that any data had been erased during that time. Indeed, he testified that the computer had not been used at all from

*cont.*

3

Nor does any other evidence clarify the scope of her research. She never testified that her research during the course of the trial was limited to *Pinkerton* liability; she never testified to the extent of her research during trial at all. No other juror testified that Wright's research during trial was limited to *Pinkerton* liability; no other juror admitted to speaking with her about her research.[2]

Myrie has thus made a colorable showing that one or more jurors were exposed to extrinsic information, and that, while the information included research regarding *Pinkerton* liability, the full scope of the information has been deliberately concealed. The "heavy burden" thus shifts to the government to prove

---

May 17, 2010, through June 25, 2011." (G.Br. 19-20 [citations omitted].) The fact that there "there were no Internet records" for the period in which the trial occurred, and that no data had been erased, would only be relevant if the hard drive had come from Wright's computer – which it did not. As the judge found, the fact that the hard drive was not used between May 2010 and June 2011 proved that "the computer hard drive turned over by Miss Wright in this case is not the same computer hard drive that she used in making her research." (Doc. 476, p.30.) The government's attempt to spin Wright's deliberate concealment of evidence should be rejected.

[2] While the judge found that Wright discussed her research with at least two other jurors, each juror denied being part of that conversation. The government argues that this may be because the jurors had forgotten the conversation, rather than because they lied under oath. (G.Br. 27, n.6.) For purposes of the government's burden to prove harmless error, the distinction is irrelevant: the jurors offered no testimony that would help the government to place limits on the prejudice caused by Wright's research.

4

that this unknown evidence, including but not necessarily limited to *Pinkerton*, was harmless to Myrie.

Here the government comes up entirely short. Its sole argument is the lack of evidence regarding Wright's conduct:

> Therefore, despite the district court's extensive efforts to discover whether harmful extrinsic information reached any member of the jury, the court unearthed absolutely no evidence that Wright had conducted research during the trial on anything other than *Pinkerton* liability or that any extrinsic information on any other subject reached the jury. Accordingly, although Myrie invites this Court to speculate that Wright researched other prejudicial matters during the trial, that she shared her findings with other jurors, and that those matters affected the outcome of the trial, the record contains no basis for this Court to do so.

(G.Br. 28.) Revealingly, the government then cites, for its rule against speculation, two cases where the burden remained on the *defendant*, because there was no evidence that extrinsic evidence ever reached the jury. (G.Br. 28), *citing United States v. Townsend*, 502 F. App'x 870, 875 (11th Cir. 2012) ("[defendant] did not identify any evidence suggesting that the jury was exposed to extraneous prejudicial information") *and United States v. Riley*, 544 F.2d 237, 242 (5th Cir. 1976) (no "showing, or even allegation, of impermissible influence").

In *this* case, where prejudicial extrinsic evidence indisputably reached the jury and the burden has shifted, the government's objection to "speculation" is

5

simply an admission that it has failed to meet its own burden. Contrary to the claim that "the court unearthed absolutely no evidence," the district court *did* unearth evidence that Wright intentionally concealed the nature and extent of her research. The district court *did* unearth the fact that no juror, including Wright herself, was able or willing to testify honestly to the extent of her research. What it did *not* unearth is any evidence that would permit the government to meet its heavy burden to prove harmless error.

**II.     Even if Wright's research was limited to *Pinkerton* liability, the government cannot prove that her research was harmless as to the other two conspiracy counts on which Myrie was convicted.**

The government next argues that, assuming Wright researched only *Pinkerton* liability during the trial (an assumption that, as discussed above, the government has failed to meet its burden to prove), that "[t]he jury's possible exposure to this extrinsic information was inconsequential as to the other counts because they had nothing to do with the *Pinkerton* doctrine." (G.Br. 29)

Remarkably, the government picks its way through its entire brief without ever addressing what the "*Pinkerton* doctrine" actually is. That is because *Pinkerton* is no more or less than the application of conspiracy liability principles to obtain a substantive conviction; it is the rule that a conspirator may be convicted

6

for the substantive crimes of his or her coconspirators if those crimes are undertaken in furtherance of the conspiracy, just as a conspirator is liable for all other actions of coconspirators. *Pinkerton v. United States*, 328 U.S. 640, 647 (1946). Any research into *Pinkerton* liability *is* research into conspiracy liability, because conspiracy liability is all that *Pinkerton* liability consists of.

In this case, Count One charged that Myrie "did knowingly and willfully conspire and agree with others" to possess with intent to distribute cocaine. There is more than a "reasonable possibility" that Wright's research into *Pinkerton* liability, i.e. whether Myrie should be convicted for crime of coconspirators based on his alleged participation in a conspiracy, influenced her view of whether Myrie was a conspirator taking part in a conspiracy – the two questions hardly have "nothing to do" with each other. And Count Four charged that Myrie did "aid and abet others … in using … a telephone … in facilitating … the conspiracy to possess … with intent to distribute cocaine as charged in Count[] One" – thus depending entirely on the jury's evaluation of Count One. The argument that the other charges had nothing to do with the *Pinkerton* doctrine should be rejected.

The government's remaining arguments regarding *Pinkerton* are equally unpersuasive. The government first argues that Myrie should have questioned

7

Wright about the details of her *Pinkerton* research (G.Br. 29-30), despite the fact that she repeatedly denied doing any research whatsoever during the trial, and falsified evidence to prevent Myrie from discovering the details forensically. It castigates Myrie for engaging in "speculation" about what the jury saw and considered (G.Br. 30 *and cases cited*), relying again on a series of cases in which the *defendant* bore the burden to prove prejudice, rather than the government bearing a heavy burden to prove lack of prejudice as it does here.

Next, the government argues that the jury did not "find Myrie guilty of the charged conspiracy based on a *Pinkerton* theory of liability," (G.Br. 31), or "apply the *Pinkerton* or aiding-and-abetting instructions to the wrong counts," (G.Br. 32). This entirely misses the point. Wright's research into *Pinkerton* liability *was* research into conspiracy liability, and was directly prejudicial to the conspiracy counts.

Finally, the government argues that the Court should not "presume" that Wright's internet research conflicted with the jury instructions, because (in preparing its appellate brief) the government ran an internet search and believes that the web pages it found describing *Pinkerton* are accurate. This is absurd. To begin with, there is no evidence that the search used by the government (which it

8

does not provide) was the same one used by Wright; that the same pages would have appeared in 2011; or that the contents of the pages are the same. And the time for the government to offer such evidence is long past. Most importantly, the law does in fact require the Court to "presume" prejudice unless the government meets its heavy burden to rebut that presumption; it cannot do so by speculating as to which exact web pages Wright found in 2011 and what she understood from them, when she herself has refused to admit to her research and has concealed the evidence of it. The notion that a conviction may be properly founded on unknown legal instructions derived from websites such as Wikipedia, rather than the legal instructions of the court, should be rejected.

### III. The government's evidence in the underlying case was not so overwhelming as to render Wright's misconduct harmless.

Finally, the government argues that the evidence on the conspiracy charges was "so overwhelming that any extrinsic information … surely was harmless as to those charges[.]" (G.Br.34.) It then proceeds to recount the evidence that, "[v]iewed in the light most favorable to the government," this Court found to be sufficient to support Myrie's conviction on direct appeal. (G.Br. 35-41.)

Yet again, the government fundamentally fails to acknowledge the standard of evidence applicable to this case. As the Court explained on direct appeal, the

9

standard for sufficiency of the evidence was extremely favorable to the government:

> The evidence is viewed in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor. A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence.
>
> Credibility questions are for the jury, and we will assume that the jury answered all of them in a manner that supports the jury's verdict. A defendant's own testimony, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt. We are bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant.

*United States v. Myrie*, 479 F. App'x 898, 900 (11th Cir. 2012) (citations and quotations omitted).

The reason for this level of deference in a sufficiency analysis is that the jury is *assumed to have applied the law correctly*, and therefore is assumed to have made all factual determinations in a way that would make its legal conclusion correct. Thus, in upholding Myrie's conviction on direct appeal, this Court wrote:

> Though Myrie testified that he was just trying to outtalk Johnson and that he was not a drug dealer trying to conduct a drug deal, *we assume that, based on the jury verdict*, the jury disbelieved Myrie and Myrie's testimony can thus be used as substantive evidence of his guilt.

*Id.* at 901 (emphasis added).

10

Obviously the same assumption does not apply where members of the jury are known to have been exposed to extrinsic evidence that is presumed to have prejudiced their ability to correctly apply the law. To the contrary, the government must now prove that the evidence complained of was so overwhelming that the extrinsic evidence was "harmless beyond a reasonable doubt." *United States v. Siegelman*, 640 F.3d 1159, 1183 (11th Cir. 2011). *See United States v. Bolinger*, 837 F.2d 436, 440 (11th Cir. 1988) (denying motion for new trial where evidence was "so overwhelming that the introduction of extrinsic evidence could not have been prejudicial").

The government makes no attempt to meet this standard; it simply recites the facts that (taken in their most favorable light) supported its case, while ignoring all of the facts that undermined it. *See* (G.Br. 35-41.)

To begin with, the government does not acknowledge Myrie's testimony – testimony that can no longer be discounted by this Court – that his recorded conversations were hyperbolic boasts rather than serious plans. It does not acknowledge that Johnson, rather than Myrie, brought up drugs on each occasion; that Myrie was drinking heavily, at Johnson's instigation, on each occasion; that none of the plans they discussed – until Johnson actually tricked Myrie into

11

attending a drug deal – ever came to fruition; that the government found no evidence to corroborate any of Myrie's boasts; or that investigators so failed to credit those boasts that they never even searched his home after his arrest.  (*See* D.Br. 8-9, Myrie's Statement of Facts*, and documents cited*.)  The evidence regarding Myrie's intent was hardly overwhelming.

Likewise, regarding the restaurant meeting where an agreement was supposedly reached (G.Br. 36-37), the government does not acknowledge that Myrie came to have lunch with Johnson only after an extended "guilt trip," on the false pretense that they would "have some fun on a friend's boat"; that Johnson once again raised the subject of drugs after they had been drinking for some time; or that Johnson himself (who stood to earn tens of thousands of dollars from setting up a successful sting) was the only one discussing any specifics of the deal. (D.Br. 9.)  The government admits that the plan Johnson offered involved a sale to Thomas, not to Myrie, but attempts to spin Myrie as "work[ing] to ensure the success of the deal" and "[a]greeing to [Johnson's] terms."  (G.Br. 36-37.)  This account depends on a reading of the transcript that is highly favorable to the

government; the transcript itself does not show Myrie as an enthusiastic participant.[3]

Following that conversation, Johnson tricked Myrie into a government warehouse for a "surprise flash" of cocaine (a subterfuge the government blandly recounts as: "the group reconvened at the undercover warehouse"). (D.Br. 9-10; G.Br. 38.) Again presenting the facts only in its favor, the government does not mention that Myrie testified he was scared to be in a warehouse with unknown, possibly armed drug dealers and played along out of fear; that he tried to leave to go to the bathroom but was refused; that the transaction agreed to between Johnson

---

[3] The exchange in which the government argues that Myrie "worked to ensure the success of the deal":

> [Johnson]: I give you, believe me [unintelligible] …
> [Myrie]: Don't worry Junior, we hear what you are saying, we hear what you are saying. Don't worry about it.

The exchange in which the government argues that Myrie was "[a]greeing to [Johnson's] terms":

> [Johnson]: Thank you sir.
> [Johnson]: And huh, you guys get in your way and come back in a week.
> [Myrie]: Done deal, Junior.

This exchange is at least as consistent with the view that Myrie was impatient with Johnson's obsession with drugs, and ready to "get [on his] way," as with the view that he was agreeing to the terms Johnson proposed.

13

and Thomas never took place; or that Myrie subsequently refused to take Johnson's calls. (D.Br. 10-11.)

Finally, the government fails to address the actual transaction for five kilos of cocaine – the transaction which was the object of the supposed conspiracy. According to the government's own witness, Myrie was not present; did not know the buyers or sellers; refused to speak with Johnson when he called afterward; and – contrary to the government's theory that Myrie was a cocaine broker who funded transactions for others (G.Br.36) – provided no money to facilitate the deal and stood to receive no money from completion of the deal. (D.Br.12; McCaffrey, 2/14/11PM, pp. 71-73.) There is no evidence that he knew the deal took place at all until he was arrested.

In sum, Myrie does not contest (as this Court found on direct appeal) that the evidence presented was "sufficient," assuming the jury properly applied the law, rejected all of his testimony, and used that testimony against him. But if the jury foreperson misinformed herself about the law of conspiracy, as we must presume, she could have credited his testimony and nevertheless wrongly encouraged the jury to convict. And if the foreperson researched other prejudicial topics such as Myrie and his music, as we must also presume given her interest in those topics

14

and here intentional cover-up, her judgment as to all counts was entirely unreliable. The government cannot remotely meet its burden to prove beyond a reasonable doubt that the error was harmless.

## CONCLUSION

For the reasons set forth above, and in Myrie's principal brief, the District Court's denial of Myrie's motion for new trial as to Counts 1 and 4 should be reversed, and a new trial granted on all three counts.

Respectfully submitted,

*s/ Charles Ogletree*
CHARLES J. OGLETREE, JR.
N.Y. State Bar No. 837629
516 Hauser Hall
1575 Massachusetts Avenue Cambridge, MA 02138
Tel: (617) 496-2054
Fax: (617) 496-3936

MAX D. STERN
Mass. Bar. No. 479560
JOHN H. CUSHMAN
Mass. Bar. No. 673936
Stern, Shapiro, Weissberg & Garin
90 Canal Street
Boston, MA 02114
Tel: (617) 742-5800
Fax: (617) 742-5858

Dated: May 6, 2014

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7). According to the program on which it is written, the numbered pages of this brief contain 3,301 words, exclusive of certificates of counsel.

*/s/Charles Ogletree*
CHARLES J. OGLETREE, JR.
Attorney for Defendant-Appellant

## CERTIFICATE OF SERVICE

I certify that on May 6, 2014, I electronically filed the foregoing brief through the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/Charles Ogletree*
CHARLES J. OGLETREE, JR.
Attorney for Defendant-Appellant